UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ACTORA MECONN BANKHEAD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-02268-TWP-TAB |
| | ) | |
| J. ERNEST, | ) | |
| J. JACKSON, | ) | |
| BROWN, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed by Defendants J. Ernest, J. Jackson, and Brown (together the "Defendants") (Dkt. 37). Plaintiff Actora Bankhead ("Mr. Bankhead"), an inmate in the Indiana Department of Corrections ("IDOC") initiated this action alleging the Defendants violated his Eighth Amendment rights by subjecting him to unsanitary conditions of confinement while he was in restricted housing at Pendleton Correctional Facility ("Pendleton"). (Dkt. 1). For the reasons explained below, summary judgment is **denied**.

## I.    SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the

1

materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573–74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.    FACTUAL BACKGROUND

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to the non-moving party, Mr. Bankhead, and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

There are very few undisputed facts in this case. The parties agree that Mr. Bankhead is an inmate in the IDOC, who has been and is currently incarcerated at Pendleton. From mid-May 2023 until December 2023, Mr. Bankhead was housed in G Cellhouse, which is a segregation unit at Pendleton. (Dkt. 38-1 at 27:18-22; 34:5-6). When Mr. Bankhead first arrived in G Cellhouse, he was placed in a "strip cell" until June 25, 2023. *Id.* at 34:8-9. While in the strip cell, he could not have his own soap or cleaning supplies in the cell. *Id.* at 13: 17-23. The officers would give Mr. Bankhead a cup of soap when they took him to take a shower. *Id.* The officers were supposed to

give Mr. Bankhead cleaning supplies in the strip cell, but they only brought supplies once after another inmate flooded their toilet. *Id.* at 16: 1-19.

After June 25, 2023 Mr. Bankhead was moved to a regular cell in G Cellhouse, which had a bunk, a desk, a toilet, and a sink. *Id.* at 9:8-9; 34:6-15. Everything was in working condition and Mr. Bankhead did not experience any plumbing, lighting, or mechanical failures. *Id.* at 18:19–19:1. Once Mr. Bankhead received his property on June 28, 2023 he was allowed to keep soap in his cell. *Id.* at 14:16-19; 34:5-15. Because he is indigent, Mr. Bankhead receives a monthly hygiene kit consisting of two razors, two motel bars of soap, two small deodorants, and two shampoos. *Id.* at 42:16-25. On at least one occasion, Mr. Bankhead used his personal soap from the hygiene kit to clean his cell. *Id.* at 42:5-25.

The Defendants all worked at Pendleton in G Cellhouse during the relevant time period. *Id.* at 36:12-25. Sergeant Ashley Brown ("Sgt. Brown") was the Correctional Sergeant in charge of G Cellhouse. (Dkt. 38-2 ¶ 3). Captain Jason Ernest ("Cpt. Ernest") was the Zone Captain over G Cellhouse. (Dkt. 38-3 ¶ 3). Lieutenant Johnathan Jackson ("Lt. Jackson") was the Unit Housing Lieutenant in charge of G Cellhouse. (Dkt. 38-4 ¶ 4).

The parties dispute the cleanliness of G Cellhouse and the cleaning protocols followed by the Defendants and the officers that they supervised, but at this stage of the proceedings, these disputes are resolved in Mr. Bankhead's favor—so the Court will discuss his version first.

**A. Mr. Bankhead's Version of the Events**

**a. Insects**

According to Mr. Bankhead, there was an infestation of cockroaches and spiders that continuously climbed on everything in his cell as well as the cells of other inmates who were incarcerated in G Cellhouse during the same time period. Dkt. 44-1 at 2 ¶ 9 (Bankhead Aff.); *see*

*also id.* at 5 ¶ 9 (Moore Aff.); *id.* at 8 ¶ 9 (Parrish Aff.); *id.* at 11 ¶ 9 (Smith Aff.); *id.* at 14 ¶ 9 (Cardosi Aff.); *id.* at 17 ¶ 9 (Bennett Aff.). Mr. Bankhead started noticing the issue with roaches in June when he observed that the trays left out in front of the cells were collecting bugs and he said something to Lt. Jackson or Cpt. Ernest. Dkt. 38-1 at 34:16–35:8. After that, Mr. Bankhead saw roaches on a daily basis, and they would crawl up and down the range and into his cell. Dkt. 38-1 at 33:5-17; 35:9-15. When he turned on his light, he would see "a whole bunch of roaches" crawling in his cell. *Id.* at 32:5-7; 33:5-15.[1] He would kill them and bag them up to show the evidence of the infestation. *Id.* at 32:11-17. When Mr. Bankhead told Cpt. Ernest and Lt. Jackson, they never sprayed his cell. *Id.* at 33:18–34:3. Cpt. Ernest would ask Mr. Bankhead why he was "bitching about some roaches" and that he should not have come to G Cellhouse if he wanted a clean cell house since G Cellhouse does not have detail workers. *Id.* at 37:10–38:15; *see also id.* at 59:4-20. Lt. Jackson would tell Mr. Bankhead that if he did not like how things were done in G Cellhouse then he should not come back. *Id.* at 38:16–39:19. Sgt. Brown told Mr. Bankhead to clean up the roaches himself. *Id.* at 40:7–41:1.

### b. Trash

Trash from the inmates' meals was routinely left on the ranges for two days and at times was left for "days on end." Dkt. 38-1 at 23:3-11; 30:17–31:6; 50:6–53:9. The available G Cellhouse logbooks designated by Mr. Bankhead reflect that officers reported cleaning up trash from the trays three times in May, four times in June, five times in July, four times in August, seven times in September, and not once in October or December. Dkt. 44-1 at 44–728.[2] The accumulated trash

---

[1] Defendants claim that Mr. Bankhead's affidavit is a "sham" because he changed his testimony about roaches. Dkt. 45 at 11. Upon reviewing Mr. Bankhead's deposition testimony, the Court does not agree that Mr. Bankhead's affidavit contradicts his deposition testimony.

[2] The Court was only able to verify about half of these dates because most of the logbook entries are unreadable due to how they were copied. Also, as Mr. Bankhead acknowledges, the logbooks are missing entries for half of August, about 15 days in October, all of November, and about half of December. The Court includes Mr. Bankhead's references

led to roaches, which infested the range and Mr. Bankhead's cell. *Id.* at 65:4-15; Dkt. 44-1 at 2 ¶ 10. When Mr. Bankhead complained about the trash to the Defendants, they generally told him to stop bitching, that their officers know what to do, and if he was concerned then he should not come to G Cellhouse. *Id.* at 58:14-24; 59:4-20.

### c.   Cleaning of the Ranges

In 2023, "detail workers" were not allowed in G Cellhouse so officers had to clean the ranges. Dkt. 38-1 at 28:22–29:8. The ranges were rarely cleaned by the officers. The available logbook entries reflect that  some officers reported that they cleaned the ranges twice in May, eight times in June, ten times in July, five times in August, ten times in September, once in October, and twice in December. *See* Dkt. 44-1 at 44–728. Mr. Bankhead could see the range and some common areas, including the showers, through his cell door because it had holes in it and by using his mirror. *Id.* at 10:1-14; 11:4-16.

### d.   Cleaning Supplies

Mr. Bankhead and other inmates were only provided with cleaning supplies about five to ten times from May to December of 2023. Dkt. 44-1 at 2 ¶ 8; *see also id.* at 5–17 (witness affidavits). The available logbook entries reflect that officers did not report conducting a "mop out sweep out" in May, October, or December. *Id.* at 44–728. Officers reported a "mop out sweep out" in the area of the range where Mr. Bankhead lived three times in June, four times in July, twice in August, and twice in September. *Id.* Mr. Bankhead repeatedly asked the Defendants for cleaning supplies, but they ignored his complaints. Dkt. 44-1 at 2 ¶ 8; *see also id.* at 5–17 (witness affidavits). When Mr. Bankhead complained to Lt. Jackson about cleaning supplies, he told him

---

to the available logbooks to the extent that they represent the date that these events were logged by officers in G Cellhouse. Given the information presently available to the Court, it does not include the logbooks for the truth of the matter asserted, or as evidence that these events actually happened on the dates recorded or did not happen on the dates that were not recorded or on the unavailable dates. *See* Fed. R. Evid. 801(c)(2).

that he would get cleaning supplies when the officers decide to give it to him, not when he wants it. Dkt. 38-1 at 46:22–47:1. Sgt. Brown told him to file a grievance. *Id.* at 47:4-11.

### e.  Cleaning of Showers

Mr. Bankhead did not witness the showers being cleaned from May to December of 2023. Dkt. 64:10-18. The available logbook entries show that officers reported cleaning the showers once in July, once in September, and once in December. Dkt. 44-1 at 44–728. Mr. Bankhead frequently encountered trash, urine, feces, blood, and the residue of OC spray on the wall when taking showers and when going in the shakedown booths. Dkt. 38-1 at 67:10–69:2; 72:14–73:6. Mr. Bankhead repeatedly told Defendants about the conditions of the showers. Dkt. 38-1 at 65:4–73:25. At one point, after Mr. Bankhead pointed out blood in the shower, Cpt. Ernest told Mr. Bankhead that outside maintenance is supposed to clean the showers. *Id.* at 71:9-19.

### f.  Receipt of Complaints

Mr. Bankhead complained to each Defendant about the conditions of his cell, the range, and the showers, but they ignored his complaints or told him to stop complaining. Mr. Bankhead also submitted several grievances and requests for interview to the Defendants and other officers describing his issues with not receiving cleaning supplies and the officers not cleaning up trash or cleaning the showers. Dkt. 44-1 at 20–43.

### g.  Mr. Bankhead's Injuries

Mr. Bankhead suffered mental anguish as well as physical harm by having to clean his cell without proper equipment and being exposed to mace in the shower stalls, which would make it hard for him to breath and see. Dkt. 38-1 at 77:3-18; 62:9-11; 69:22–70:12. Mr. Bankhead submitted healthcare request forms asking for help to mitigate the unsanitary conditions as well as help to deal with the stress. Dkt. 44-1 at 28–30.

### B. The Defendants' Version of the Events

#### a. Insects

Insects were present in some areas of Mr. Bankhead's range and cell. *Id.* at 32:20–36:2. Lt. Jackson routinely performed pest control services by spraying inmate and staff areas. Dkt. 38-3 ¶ 8. Lt. Jackson did not spray inside inmate's cells due to safety concerns about the pesticide. Dkt. 38-4 ¶ 8–9. If an inmate reported pests, Lt. Jackson promptly took steps to spray the area. *Id.* ¶ 10. Sgt. Brown reported pest and sanitation concerns in shift reports and notified appropriate supervisors. Dkt. 38-2 ¶ 8. Cpt. Ernest does not recall seeing infestation beyond "ordinary minor insects" that were taken care of through routine spraying. (Dkt. 38-3 ¶ 14).

#### b. Trash

During the Defendants' shifts, staff collected trash and meal trays between meals. (Dkt. 38-2 ¶ 13; dkt. 38-3 ¶ 12; Dkt. 38-4 ¶ 12). Cpt. Ernest did not see any food trays left out for extended periods. (Dkt. 38-3 ¶ 13).

#### c. Cleaning of the Ranges

Sgt. Brown testified that officers in G Cellhouse swept and mopped the ranges "at least weekly, and night shift staff was expected to sweep and mop daily." (Dkt. 38-2 ¶ 5). When Sgt. Brown was working, she "ensured trays were collected and ranges were cleaned to the extent staffing and security allowed." *Id.* If night shift did not complete their cleaning tasks, Sgt. Brown "made efforts to ensure cleaning was completed" or she reported the issue. *Id.* According to Cpt. Ernest and Lt. Jackson, cleaning responsibilities for showers and ranges were performed daily by facility sanitation crews and if they could not be completed, the unit staff completed the tasks. Dkt. 38-3 ¶ 9; dkt. 38-4 ¶ 11 ("when sanitation staff were unable to reach the unit, correctional staff completed cleaning tasks.").

### d. Cleaning Supplies

According to Sgt. Brown, officers tended to offer inmates cleaning supplies every other day. (Dkt. 38-2 ¶ 6). This usually occurred on the days that the inmates showered. *Id.* Sometimes cleaning was hindered by issues with staffing shortages and security. *Id.* At some point, "a designated cleaning time was put into place on Sundays" where inmates were provided with cleaning supplies. (Dkt. 38-2 ¶ 14; dkt. 38-4 ¶ 19). According to Cpt. Ernest and Lt. Jackson, inmates in G Cellhouse "were afforded an opportunity to clean their cells at least once per week, commonly referred to as 'mop-out and sweep-out.'" Dkt. 38-3 ¶ 7; dkt. 38-4 ¶ 6. During this time, inmates were given a mop, a broom, and a sanitation chemical such as Germ-Away Disinfectant. Dkt. 38-3 ¶ 7; dkt. 38-4 ¶ 6.

Efforts were made to accommodate inmates who requested cleaning supplies. Dkt. 38-2 ¶ 6. Sgt. Brown did not deny Mr. Bankhead cleaning supplies for "punitive reasons." *Id.* ¶ 7. Instead, if Mr. Bankhead's request was delayed, "it would have been due to staffing, security events, or other operational priorities[.]" *Id.* Cpt. Ernest and Lt. Jackson did not personally deny "any incarcerated individual cleaning supplies[.]" Dkt. 38-3 ¶ 8; dkt. 38-4 ¶ 7.

### e. Cleaning of Showers

According to Cpt. Ernest, the showers were cleaned every day after operations by facility sanitation crews. Dkt. 38-3 ¶ 9. Cpt. Ernest did not witness any residue from OC spray, feces, blood, or bodily fluids left in the showers. *Id.* ¶ 11. Residual OC spray was "not allowed" to be left in the showers. *Id.* ¶ 10. Cleanup of any residual OC spray should be documented as part of the required use of force report every time that an officer deploys OC spray. Dkt. 38-4 ¶ 14. If Sgt. Brown became aware of residual chemical agents in the showers, she reported it so that sanitation workers could respond. Dkt. 38-2 ¶ 9.

### f.  Receipt of Complaints

When Sgt. Brown and Lt. Jackson received verbal complaints from Mr. Bankhead about sanitation, they told him to use the formal grievance system, and they documented concerns in the shift reports and logbooks. Dkt. 38-2 ¶ 11; Dkt. 38-4 ¶ 15. Sgt. Brown and Lt. Jackson did not have direct authority over sanitation resources and staffing. Dkt. 38-2 ¶ 11; Dkt. 38-4 ¶ 15. Cpt. Ernest does not recall ever receiving complaints from Mr. Bankhead about sanitation. Dkt. 38-3 ¶ 13.

### g.  Mr. Bankhead's Injuries

Mr. Bankhead suffered minimal physical harm from the conditions of G Cellhouse. On one occasion, he had to clean his cell with his own hands, without any gloves or cleaning supplies. Dkt. 38-1 at 77:13-18.

### III.    DISCUSSION

Under the Eighth Amendment, "prisoners cannot be confined in inhumane conditions." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). An Eighth Amendment conditions-of-confinement claim includes both an objective and subjective component. *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019). Under the objective component, a prisoner must show that the conditions were objectively serious and created "an excessive risk to his health and safety." *Id.* Conditions of confinement count as objectively serious when they deny a prisoner "the minimal civilized measure of life's necessities," such as sanitation and adequate shelter. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *Thomas v. Illinois*, 697 F.3d 612, 614 (7th Cir. 2012); *Vinning–El v. Long*, 482 F.3d 923, 924 (7th Cir. 2007). Under the subjective component, a prisoner must establish that the defendants had a culpable state

9

of mind—that they "were subjectively aware of these conditions and refused to take steps to correct them, showing deliberate indifference." *Thomas*, 2 F.4th at 720.

Defendants argue that Mr. Bankhead's Eighth Amendment conditions-of-confinement claims fail as a matter of law because (1) he has not alleged that he sustained physical injuries; (2) the conditions were not objectively serious; (3) the Defendants did not subjectively disregard any serious risks to his health; and (4) the Defendants are entitled to qualified immunity. (Dkt. 39). As explained below, the Court rejects these arguments.

### A. Failure to Allege Physical Injury

Defendants argue that Mr. Bankhead fails to state a claim because he did not allege that he was physically injured by the conditions-of-confinement at issue in this lawsuit. (Dkt. 39 at 11). They claim that this omission is fatal to his entire lawsuit. But this is not the law. The Prison Litigation Reform Act imposes a "limitation on recovery," stating that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury[.]" 42 U.S.C. § 1997e(e). The Seventh Circuit has continuously interpreted this provision to mean that "a prisoner cannot obtain *compensatory damages* without proving a physical injury." *Thomas v. Illinois*, 697 F.3d 612, 614 (7th Cir. 2012) (emphasis added). Nevertheless, psychological harms alone may still give rise to an Eighth Amendment violation and provide a basis for a civil action for nominal and punitive damages as well as injunctive relief. *Id.* (citing *Calhoun v. DeTella*, 319 F.3d 936, 940 (7th Cir. 2003)); *see also Byrd v. Hobart*, 761 F. App'x 621, 623 (7th Cir. 2019).[3]

---

[3] Defendants argue that *Calhoun* is inapposite because the case involved conduct designed to demean and harass the plaintiff, not "imperfect sanitation and intermittent pests." Dkt. 45 at 12. The specific Eighth Amendment violation at issue in *Calhoun*, however, does not change the conclusion that the plain language of § 1997e(e) "limits recovery for 'mental and emotional injury,' but leaves unaffected claims for nominal and punitive damages, which seek to remedy a different type of injury." 319 F.3d at 941. Indeed, *Calhoun* explicitly states that, similar to First Amendment and Due Process claims, "the violation of a person's right to be free from cruel and unusual punishment" is a standalone injury. *Id.* Thus, "[b]ecause nominal damages are awarded to vindicate rights, not to compensate for resulting injuries,

10

Therefore, Mr. Bankhead's claim can survive even without an allegation that he suffered a physical injury.

In addition, as Mr. Bankhead points out, he does allege that he suffered physical harm by having to clean his cell without protective equipment and breathing in residual OC spray in the showers. (Dkt. 61:21–62:7). He also alleges that the physical harm is evidenced by his healthcare request form that references having to take antibiotics and being sick by living in the unsanitary conditions. *See* dkt. 43 at 3; dkt. 44-1 at 22. Moreover, as will be discussed below, Mr. Bankhead alleges that the conditions put him at risk of future harm to his health. The Seventh Circuit has held that the Eighth Amendment protects prisoners "from an official's deliberate indifference to conditions posing an unreasonable risk of serious damage to the prisoner's future health. *Henderson v. Sheahan*, 196 F.3d 839, 846–47 (7th Cir. 1999) (citing *Helling v. McKinney*, 509 U.S. 25, 33–35 (1993)); *see also Byrd*, 761 F. App'x at 623–24 (reversing and remanding district court's grant of summary judgment for defendants because pest infestation presented unreasonable risk of serious damage to plaintiff's health).

Accordingly, the Court finds that Mr. Bankhead adequately pled his Eighth Amendment claims. First, the allegations that he suffered mental anguish suffice to state a claim even though he will not be able to recover compensatory damages unless he also proves that he suffered physical injuries. Second, Mr. Bankhead does allege that he suffered actual physical harm from his exposure to the OC spray and that he suffered the risk of future harm from having to clean without proper cleaning supplies and from being exposed to cockroaches, blood, feces, and OC spray.

---

we hold that § 1997e(e) does not bar a suit seeking nominal damages to vindicate Eighth Amendment rights . . . For similar reasons we believe that § 1997e(e) does not preclude claims for punitive damages for violations of the Eighth Amendment." *Id.* at 942. Nowhere does *Calhoun* limit its holding to the specific facts of the case.

**B. Whether the Conditions in Mr. Bankhead's Cell Were Objectively Serious**

Defendants argue that Mr. Bankhead's cell conditions did not present an objectively serious risk of harm to him because the Defendants had cleaning protocols, Mr. Bankhead did receive cleaning supplies, all the fixtures in his cell were working, the pest infestation was not extreme, and Mr. Bankhead could use his personal soap from his monthly indigent hygiene kit to clean his cell. (Dkt. 39 at 11–12.) Defendants also argue that Mr. Bankhead has not adequately supported his assertion that he suffered a risk of future harm beyond speculating about the dangers of pests. (Dkt. 45 at 12–13).

Contrary to the Defendants' assertion that Mr. Bankhead has not effectively disputed their version of events, the Court finds that his testimony and records create disputes of fact over the seriousness of the conditions that he endured, which preclude summary judgment. For one, Defendants mischaracterize Mr. Bankhead's deposition testimony by stating that insects were merely "present." Mr. Bankhead testified in his deposition that he saw cockroaches crawling all over his cell on a daily basis. Dkt. 38-1 at 35:12-15 ("you would see [cockroaches] daily because you got trash out here, so it's accumulating roaches, they bringing the roaches out. So it's always roaches running around."). Second, Mr. Bankhead's testimony about the infrequency of trash pick-up supports his assertion that the cockroach problem was serious, and Defendants and Mr. Bankhead have completely different stories about how often trash was picked up. Third, Mr. Bankhead and Defendants also have opposing accounts of how often he was given cleaning supplies as well as whether the showers were ever cleaned and whether they frequently had blood, feces, and OC spray. Resolving these factual disputes at summary judgment is inappropriate. *See Johnson v. Advocate Health and Hospitals Corp.* 892 F.3d 887, 893 (7th Cir. 2018) ("As we

12

have said many times, summary judgment cannot be used to resolve swearing contests between litigants.") (internal quotation omitted).

These disputed facts are material to the resolution of the case, because if a jury believes Mr. Bankhead's version of events, then they could find that his cell conditions were objectively serious for the purposes of the Eighth Amendment. This is because courts assessing the objective severity of prison conditions must consider their nature, duration, and the harm caused to the plaintiff, in conjunction. *See Thomas*, 697 F.3d at 614–15. Furthermore, "[s]ome conditions of confinement may establish an Eighth Amendment violation in combination when each alone would not do so" when they have a mutually enforcing effect that deprives the plaintiff of a human need. *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006); *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016); *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). Sanitation is a human need. *See Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013) (citing *Gillis*, 468 F.3d at 493; *Vinning–El*, 482 F.3d at 924). Moreover, "[h]ygienic supplies sufficient to meet basic needs are constitutionally required." *Gray*, 826 F.3d at 1006.

Here, the conditions by themselves might not meet the objectively serious threshold. Nevertheless, for six months, Mr. Bankhead experienced constant exposure to cockroaches and trash in his cell as well as blood, feces, and OC spray in the shower stalls. During these six months, he was only given cleaning supplies around five to ten times. The cockroaches and trash reinforced one another to produce unsanitary living quarters that Mr. Bankhead could not clean on a regular basis. Though Mr. Bankhead could have used his monthly indigent hygiene kit, that would have meant that he would not have the limited supply of soap to wash himself. In addition, Mr. Bankhead's exposure to feces, blood, and OC spray in the shower stalls exacerbated his inability to clean himself and his surroundings. Considering all these conditions together, for six months, a

13

jury could conclude that the cell conditions deprived Mr. Bankhead of adequate sanitation. *See Gray*, 826 F.3d at 1005–06 (finding that extensive pests combined with the lack of adequate cleaning supplies and broken windows satisfied the objective component of the plaintiff's Eighth Amendment claim because each condition exacerbated the situation); *Rodriguez v. Martz*, 2023 WL 5431754, at *2 n.3 (S.D. Ind. Aug. 23, 2023) ("[A]s a matter of logic, a pest infestation amplifies the harm caused by a denial of cleaning supplies, and a denial of cleaning supplies suggests deliberate indifference to the harm caused by a pest infestation.").

The combination and duration of Mr. Bankhead's cell conditions also makes Defendants' cases inapposite. For example, in *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008), the Seventh Circuit found that an unpleasant odor, peeling paint, lack of air-conditioning, and *occasional* cockroaches that were consistently sprayed did not violate the plaintiff's Fourteenth Amendment rights.[4] In contrast, Mr. Bankhead alleged a continuous infestation of cockroaches combined with mutually reinforcing conditions that are much more severe than peeling paint and unpleasant odor. Furthermore, the plaintiff in *Sain* acknowledged that an exterminator frequently sprayed his cell for pests. Here, Mr. Bankhead has not adequately disputed that Lt. Jackson exterminated the facility, but his testimony creates a dispute of fact over the frequency. Also, Lt. Jackson concedes that he did not spray inmates' individual cells. Similarly, *Munson v. Kink*, 2022 WL 17844068, at * 2 (7th Cir. Dec. 22, 2022) affirmed summary judgment where the plaintiff only complained about pests and conceded that the defendants hired a monthly exterminator. Last, *Chandler v. Neal*, 2023 WL 4295306, at *2 (N.D. Ind. June 30, 2023) granted summary judgment to the defendants because undisputed evidence showed that the defendant, the warden, was not deliberately

---

[4] In *Sain*, the Court applied the deliberate indifference standard of the Eighth Amendment to the plaintiff's claims since it predated the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). *Sain*, 512 F.3d at 893–94.

indifferent to the pest problem. The court did not analyze the objective component of the Eighth Amendment.

Last, in their reply Defendants argue that Mr. Bankhead has not adequately supported his assertion that the conditions of his cell created a significant risk of future harm aside from speculating about the dangers of cockroaches. (Dkt. 45 at 12–13). Defendants rightly point out that Mr. Bankhead cannot rely on speculation; he must show "'to a degree of reasonable medical certainty' that he actually faced an increased risk of injury." *Byrd*, 761 F. App'x at 624 (quoting *Gray*, 826 F.3d at 1007). For the purposes of surviving summary judgment, Mr. Bankhead has done so. Mr. Bankhead submitted a letter from the Center for Disease Control concerning the long-term health effects of exposure to OC spray, including breathing and vision issues. (Dkt. 44-1 at 475).[5] He also testified about how OC spray in the small, enclosed shower stalls got in his eyes and made it hard to breath once it interacted with the shower mist. *See* (Dkt. 61:21–62:7). Thus, the record contains evidence that Mr. Bankhead inhaled OC spray in an enclosed area, supporting an inference that he could suffer health effects from the exposure. Moreover, as Mr. Bankhead points out in his response, courts have recognized that exposure to cockroaches, feces, and blood carry significant risk of future harm. *See Byrd*, 761 F. App'x at 624 ("[C]ockroaches can transmit bacteria that aggravate asthma and cause other disease . . . ."); *Thomas*, 697 F.3d at 615 (collecting studies reflecting the physical harm from cohabitating with cockroaches); *Shannon v. Graves*, 257 F.3d 1164, 1168 (10th Cir. 2001) ("[E]xposure to the human waste of others carries a significant risk of contracting infectious diseases.").

---

[5] Mr. Bankhead's citation to the CDC's article about the Ectobius vittiventris species of cockroach in Switzerland does not support an inference that he faced an increased risk of injury because it deals with a specific kind of cockroach in Swiss hospitals.

In sum, taking all inferences in Mr. Bankhead's favor, a reasonable jury could conclude that Mr. Bankhead faced objectively serious conditions of confinement that created an excessive risk to his health and safety.

## C.  Whether the Defendants Were Deliberately Indifferent

Defendants argue that the record does not allow a reasonable jury to conclude that the Defendants acted with deliberate indifference because they had cleaning protocols, such as "mop out sweep out," Lt. Jackson sprayed pesticides on a regular basis, and the Defendants logged concerns about cleanliness. (Dkt. 39 at 14). As seen above, however, Mr. Bankhead's testimony and records dispute these facts. Mr. Bankhead testified that he repeatedly complained to all three Defendants and that they told him to stop complaining and that if he wanted a clean cellhouse he should not come to G Cellhouse. His requests for interview also show that he personally wrote to Lt. Jackson and Cpt. Ernest about his issues with cleaning supplies, trash, and pests. He testified that he did not see or experience the Defendants and their officers adhering to the cleaning protocols on a regular basis and that he never saw anyone clean the showers. Furthermore, although Mr. Bankhead's testimony is no doubt limited to his personal experience, he testified that he could see the range, including the showers, through his cell door and his mirror. Moreover, the Defendants' testimony is not entirely consistent regarding how the ranges and showers were cleaned. Sgt. Brown testified that the officers cleaned the ranges, while Lt. Jackson and Cpt. Ernest testified that a sanitation crew was primarily responsible for cleaning. And, Mr. Bankhead testified that "detail workers," inmates who perform sanitation duties, were not assigned to G Cellhouse during the events in the lawsuit. As stated above, these are all factual matters that cannot be resolved at summary judgment.

16

Taking all inferences in Mr. Bankhead's favor, a jury could find that the Defendants' responses to Mr. Bankhead's complaints, coupled with the sparse cleaning, trash pickup, and "mop out sweep out," demonstrates that the Defendants knew about the unsanitary conditions and refused to do anything to mitigate them. In this way, a jury could find that the Defendants did not act reasonably to respond to the risk created by the unsanitary conditions. *See, c.f.*, *Thomas*, 2 F.4th at 721 (explaining that the plaintiff did not satisfy the subjective component of his Eighth Amendment claim because the record showed that the defendants promptly gave him an unsoiled mattress and cleaning supplies to deal with his unsanitary cell conditions).

### D.  Qualified Immunity

Last, the Defendants assert that they are protected by qualified immunity. "[Q]ualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "Once the defense of qualified immunity is raised, a defendant is entitled to dismissal unless a plaintiff comes forward with facts showing a constitutional violation and law showing his right was 'clearly established' at the time of the alleged violation." *Thomas v. Carmichael*, 164 F.4th 1058, 1067 (7th Cir. 2026) (quoting *Siddique v. Laliberte*, 972 F.3d 898, 902-03 (7th Cir. 2020)). "The plaintiff bears the burden of demonstrating that a right was clearly established at the time the alleged violation occurred." *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017). That said, the Seventh Circuit has stated that "a plaintiff's failure to cite a case on point is 'not fatal by itself[,]'" and instead the court has a duty to "determine qualified immunity in light of all relevant precedents—both those cited by the parties and those we discover ourselves.'" *Taylor v.*

*Schwarzhuber*, 132 F.4th 480, 487 (7th Cir. 2025) (quoting *Kernats v. O'Sullivan*, 35 F.3d 1171, 1176-77 (7th Cir. 1994)).

The "clearly established" standard ensures "that officials can 'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Anderson v. Creighton*, 483 U.S. 635, 646 (1987)). To be "clearly established," a constitutional right "must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). Given this emphasis on notice, clearly established law cannot be framed at a "high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Wesby*, 583 U.S. at 64 (quoting *Anderson*, 483 U.S. at 641). While "a case directly on point" is not required, "precedent must have placed the . . . constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (cleaned up). Put slightly differently, a right is clearly established only if "every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015). "The Supreme Court's message is unmistakable: Frame the constitutional right in terms granular enough to provide fair notice because qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Campbell v. Kallas*, 936 F.3d 536, 546 (7th Cir. 2019) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quotation marks omitted)). Qualified immunity thus "balances two important interests— the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231.

18

This opinion has already described several Seventh Circuit opinions which are factually similar to Mr. Bankhead's sanitation claim and predate it. *Gray*, 826 F.3d at 1005 (finding that "myriad infestations" combined with a "lack of access to adequate cleaning supplies" deprived the plaintiff "of the basic human need of rudimentary sanitation in violation of the Eighth Amendment" where the plaintiff alleged that he encountered roaches, birds left droppings, mice ate his food, and he only got a watered-down disinfectant spray); *see also Johnson v. Pelker,* 891 F.2d 136, 139–40 (7th Cir. 1989) (reversing summary judgment where prisoner was denied cleaning supplies and confined for three days to cell that was smeared with human waste and lacked running water); *Taylor v. Riojas*, 592 U.S. 7, 8–9 (2020) (denying qualified immunity because it was clearly established that housing prisoners in cells with large amounts of human waste, even for only six days, could violate the Eighth Amendment); *Antonelli v. Sheahan*, 81 F.3d 1422, 1433 (7th Cir. 1996) (only spraying for pests twice in sixteen months showed deliberate indifference when the plaintiff complained of a severe infestation that impacted his sleep); *Hardeman v. Curry*, 933 F.3d 816, 821 (7th Cir. 2019) ("continued exposure to human excrement can violate the Eighth Amendment.") (citing *DeSpain, v. Uphoff,* 264 F.3d 965, 974-75 (10th Cir. 2001) ("Exposure to human waste, like few other conditions of confinement, evokes both the health concerns emphasized in *Farmer* and the more general standards of dignity embodied in the Eighth Amendment.")). Furthermore, as seen above, the Seventh Circuit has repeatedly stressed that even though some conditions may not violate the Eighth Amendment in isolation, mutually reinforcing combined conditions violate the Eighth Amendment when they deprive the plaintiff of a basic human need, such as sanitation. *See Gillis*, 468 F.3d at 493; *Gray*, 826 F.3d at 1005.

The Eighth Amendment violations that Mr. Bankhead alleges were therefore clearly established when they occurred in 2023. Accordingly, Defendants are not entitled to qualified immunity.

**IV.**
**Conclusion**

For the reasons explained in this Order, the Defendants' Motion for Summary Judgment, Dkt. [37] is **DENIED**.  This matter remains scheduled for Final Pretrial Conference on January 13, 2027 and trial by jury on February 8, 2027.  Mr. Bankhead's Eighth Amendment claims will have to be resolved through settlement or trial.

The Court reconsiders its previous denial of Mr. Bankhead's request to recruit counsel. (Dkt. 16). Because his claims have survived summary judgment, Mr. Bankhead's Motion to Appoint Counsel, Dkt. [12], is **GRANTED** to the extent that the Court will attempt to recruit counsel to help Mr. Bankhead resolve this case through settlement or trial.

Once the Court recruits counsel, the Magistrate Judge is asked to schedule a telephonic status conference to discuss further proceedings.

**IT IS SO ORDERED.**

Date: 5/18/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

ACTORA MECONN BANKHEAD
914468
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

James Bolen
Lewis and Wilkins LLP
bolen@lewisandwilkins.com

Eric Ryan Shouse
Lewis and Wilkins LLP
shouse@lewisandwilkins.com


Magistrate Judge Tim Baker